UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERICKSON PRODUCTIONS INC, et al.,

                Plaintiffs,

     v.

KRAIG RUDINGER KAST, et al.,

                Defendants.

Case No. 13-cv-05472-DMR

**ORDER RE: WILLFULNESS AND DAMAGES FOLLOWING REMAND**

Re: Dkt. Nos. 372-376

Plaintiffs Erickson Productions, Inc. ("Erickson Productions") and Jim Erickson (together, "Erickson") filed suit against Defendant Kraig Kast in September 2013 alleging that Kast infringed Erickson's copyrights in three photos. Following a three-day trial in April 2015, a jury found that Kast vicariously and contributorily infringed Erickson's copyrights and did so willfully. It awarded Erickson $150,000 in statutory damages per photo, for total damages of $450,000, and the Honorable Howard R. Lloyd entered judgment for that amount against Kast. Kast appealed the judgment. The United States Court of Appeals for the Ninth Circuit affirmed the judgment in part, reversed the judgment in part, and remanded on the issue of willfulness. *Erickson Prods., Inc. v. Kast*, 921 F.3d 822 (9th Cir. 2019).

Following Judge Lloyd's retirement, the matter was reassigned to the undersigned upon remand. [Docket No. 351.] Now before the court is the parties' cross-briefing regarding the issues of willful infringement and the amount of statutory damages that should be awarded if the evidence does not support a finding of willfulness. [Docket Nos. 372-376.] Having carefully considered the parties' briefing, the evidence at trial, and the relevant authority, the court concludes that the evidence supports a finding of willfulness and awards Erickson $450,000 in statutory damages.

United States District Court
Northern District of California

## I.      BACKGROUND AND PROCEDURAL HISTORY

This copyright action concerns a dispute over the unauthorized and unlicensed use of Erickson's photos on a website.  The following is a brief summary of the facts of this case and its procedural history.  *See Erickson*, 921 F.3d at 826-829.  The evidence presented at trial is discussed in detail below in Section II.

Erickson is a professional photographer who licenses his photos through his company, Erickson Productions.  Kast is a California resident who owns various businesses, including Atherton Trust, a real estate wealth management company.  In 2010, Kast rehired website developer Only Websites Inc. ("Only Websites") to redevelop Atherton Trust's website.[1]  In connection with this project, Kast completed a questionnaire for Only Websites outlining his goals for the website.  He identified Wells Fargo Private Bank ("Wells Fargo") as a competitor of Atherton Trust and highlighted certain features of Wells Fargo's website that he found appealing.  During the design process, Only Websites incorporated three photos from Wells Fargo's website into Atherton Trust's developmental website.  The photos had been taken by Jim Erickson and licensed to Wells Fargo.  Neither Kast, Atherton Trust, nor Only Websites had licensed the photos from Erickson.  In July 2011, after discovering the use of the copyrighted works, Erickson demanded that Atherton Trust cease and desist the infringement and pay damages.  Only Websites promptly removed the photos from the website at Kast's direction but Kast refused to pay the requested damages.

Erickson filed suit in the Central District of California, alleging direct, vicarious, and contributory copyright infringement.  Erickson asserted the infringement was willful and therefore subject to enhanced damages under 17 U.S.C. § 504(c)(2), which provides that "[i]n a case where the copyright owner sustains the burden of proving, and the court[2] finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a

---

[1] Only Websites developed the original Atherton Trust website in 2006.  Tr. Vol. II 175.

[2] Notwithstanding the language of 17 U.S.C. § 504(c), "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself."  *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998).

1    sum of not more than $150,000."  The action was transferred to this district in December 2013 and

2    assigned to Magistrate Judge Howard R. Lloyd.  [Docket Nos. 14-16.][3]

3         The case was tried to a jury on April 13-15, 2015.  [Docket Nos. 102-104.]  On April 15,

4    2015, the jury found that Kast was liable for vicarious and contributory infringement (but not

5    direct) for each of the three photos on the basis that "Only Websites did not have permission to

6    copy or publish copies of" the photos and "thus infringed [Erickson's] copyrights by doing so"

7    and that the infringement was willful.  It awarded $150,000 in statutory damages per photo under

8    17 U.S.C. § 504(c)(2), for total damages of $450,000.  [Docket Nos. 105 (Jury Instruction Nos. 16

9    (Vicarious Infringement), 17 (Contributory Infringement)); 107 (Verdict).]  The court entered

10   judgment for Erickson on August 19, 2015.  [Docket No. 118 (Judgment).]  Kast appealed,

11   arguing in relevant part that the court improperly instructed the jury on the issue of willfulness for

12   purposes of section 504(c)(2).

13        The Ninth Circuit affirmed the judgment in part, reversed in part, and remanded.

14   Specifically, it vacated the jury's vicarious liability verdict and affirmed the contributory liability

15   verdict.  *Erickson*, 921 F.3d at 829-32.  It vacated the jury's finding of willfulness, which was

16   relevant to the amount of its award of statutory damages.  *Id*. at 833-34.  Absent a finding of

17   willfulness, a jury may award statutory damages "in a sum of not less than $750 or more than

18   $30,000" per work infringed.  *Id*. at 833 (quoting 17 U.S.C. § 504(c)(1)).  Noting that "[a]

19   determination of willfulness requires an assessment of a defendant's state of mind," the Ninth

20   Circuit explained that proving willfulness under the Copyright Act requires a showing "(1) that the

21   defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the

22   result of reckless disregard for, or willful blindness to, the copyright holder's rights."  *Id*. at 833

23   (quoting *Friedman v. Live Nation Merch*., Inc., 833 F.3d 1180, 1186 (9th Cir. 2016) and

24   *Unicolors, Inc. v. Urban Outfitters, Inc*., 853 F.3d 980, 991 (9th Cir. 2017)).

25        In this case, the district judge instructed the jury that "[i]nfringement is considered willful

26   when . . . (1) the defendant knew that those acts infringed plaintiffs' copyrights; or, (2) the

27

28   _____

[3] Erickson obtained a default judgment against Only Websites in the United States District Court for the Southern District of New York.  *Erickson*, 921 F.3d 827 n.2.

3

United States District Court
Northern District of California

United States District Court
Northern District of California

defendant *should have known* that those acts infringed plaintiffs' copyright; or, (3) the defendant engaged in conduct that was reckless or demonstrated a reckless disregard for plaintiffs' copyrights." *Id*. at 833 (ellipses and emphasis in original); Jury Instruction No. 21.  The Ninth Circuit concluded that the district court had erroneously instructed the jury because "[a] 'should have known' instruction does not fit within this framework because it is a negligence standard," and "[n]egligence is a less culpable mental state than actual knowledge, willful blindness, or recklessness, the three mental states that properly support a finding of willfulness." *Erickson*, 921 F.3d at 833 (citations omitted).

The Ninth Circuit further determined that "[t]he erroneous willfulness instruction was likely prejudicial to Kast," and "remand[ed] the issue of willfulness to the district court on the existing record." *Id*. at 833, 834.  It observed that "[w]hile the evidence may have stablished that Kast was negligent, it is much less clear that it established recklessness, willful blindness, or actual knowledge," and that "[i]f the jury had been properly instructed, it might well have refused to find Kast willful on this record." *Id*. at 834-45.  However, it "disagree[d] with Kast's claim that 'the record permits only one resolution of the factual issue' of willfulness and decline[ed] his invitation to enter judgment in his favor." *Id*. at 835 (internal citation omitted).

Following Judge Lloyd's retirement, the matter was reassigned to the undersigned upon remand.  [Docket No. 351.]  The court ordered the parties to submit simultaneous opening and responsive briefs addressing (1) whether the evidentiary record supports a finding of willful infringement under the correct legal standard; and (2) what statutory damages should be awarded if the evidence does not support a finding of willfulness.  [Docket No. 358.]  The parties timely filed the requested briefing.  [Docket Nos. 372-376.]

## II.     EVIDENCE PRESENTED AT TRIAL

### A.      Evidence Regarding Infringement and Willfulness

Before trial, the parties stipulated to the following facts: 1) Erickson owns registered copyrights in the three photos at issue; and 2) Erickson's three photos were copied without permission and then published on the Atherton Trust website without a license.  [Docket No. 173 (Tr. Vol. III) 507.]  Additionally, the court found at summary judgment that it was "undisputed

4

United States District Court
Northern District of California

that the entire photos were copied and used [on the Atherton Trust website] exactly as they appeared on Wells Fargo's site." [Docket No. 70 (Oct. 28, 2014 Order on Summ. J.) at 5.]

### 1.      The Development of the Atherton Trust Website

Kast founded Atherton Trust in 2005. [Docket No. 172 (Tr. Vol. II) 162.] It was originally a real estate wealth management company that provided property management, brokerage, and financial services. *Id*. at 163. The company "went dormant in 2007." *Id*. at 176. At some point around 2010 Kast learned of an "opportunity to be named by the probate court to represent people who were mentally or physically incapacitated and to manage their estates" that required state court review and approval. He hired Only Websites, LLC ("Only Websites") to redevelop the Atherton Trust website (athertontrust.com) in order to apply for the probate court work. *Id*. at 173-76. The redeveloped website was part of his marketing plan for the "relaunch" of the company, including telemarketing, newspaper interviews, and advertisements. *Id*. at 294-95. The target date for completion of the website redesign was mid-February 2011, in order to coordinate with his marketing plan. *Id*. at 294.

Kast executed an agreement with Only Websites on December 13, 2010 for the website redesign. [Docket No. 373, McCulloch Decl. Aug. 1, 2019) ¶ 6, Pls.' Ex. 5.[4]] In relevant part, it specified that the "Client agrees to provide content and other material by agreed upon deadlines . . . before Client's website begins, as well as throughout the development process," and that Client would be "asked to sign off on work completed and approved, including the design, development and finalization of the website." The agreement also provided that "Client is responsible for obtaining copyright releases and licenses on all photos it sends to [Only Websites]. Limit of 2 photos provided by [Only Websites] for every page except the home page." *Id*. at 2 (K034-35). Kast testified that he understood this provision to mean that "[a]nything that I sent to them had to be licensed," and that if Only Websites "provided the photos, [it] had to provide licensed photos." Tr. Vol. II 291.

On December 14, 2010, after executing the agreement with Only Websites, Kast

---

[4] All further references to the trial exhibits attached to the McCulloch declaration will be cited as "Pls.' Ex. #."

United States District Court
Northern District of California

1   completed a questionnaire that asked him, among other things, to identify examples of

2   competitors' websites.  Pls.' Ex. 11.  Kast testified that he selected five that had "the best look, the

3   best functionality" and were "the easiest to use," and listed the five websites' URLs in his

4   response to the questionnaire.  Tr. Vol. II 180-81.  He listed

5   https://www.wellsfargo.com/theprivatebank/ as the first of the five examples, noting that the

6   website had "the "positive attributes" of being "easy to navigate with drop down windows,

7   navigation, feel."  Pls.' Ex. 11 at K058.  Kast wrote, "WF site is professional yet has personal

8   feel."  *Id*. at K059.  Under "special instructions," he noted "[d]rop downs from tabs to open

9   automatically and in sequence when opening site to show they are available to the viewer (like on

10   WF site)."  *Id*. at K060.

11       Kast also indicated in the questionnaire that he would provide a logo and graphics.  He

12   stated that "I need to choose photos from options you provide."  *Id*. at K059.  Kast testified that

13   when Only Website first built the website in 2006, it had "recommended certain photos of a

14   certain size to be used on the website.".  For the redesign, he "wanted Only Websites to

15   recommend photos that they thought would be most appropriate for the new site, how large they

16   were, type of content, the look and feel, because [they were] more knowledgeable about what will

17   get a response from people than" he was.  Tr. Vol. II 293-94.

18       Additionally, next to "designer-phone-conversation" Kast wrote, "yes."  Pls.' Ex. 11 at

19   K058.  He testified that this meant that his preference was to "talk about things on the phone" as

20   opposed to communicating by email or instant messaging.  Tr. Vol. II 292-93.

21       On December 16, 2010, Only Website developer Ellen Wilson emailed Kast and asked

22   whether Only Websites would "be using mostly the content that is on" Atherton Trust's current

23   website for the redesign.  Pls.' Ex. 10.  Kast responded, "[t]he content will be updated so not much

24   will transfer over from our current site.  Think of this as a rebranding effort.  We will leverage the

25   content from the competitor's sites as we have a different way of servicing our clients with the

26   same services that our competitors (the banks and stockbrokers) provide.  *Id*.; *see also* Tr. Vol. II

27   216-17.  Kast testified that his reference to "leverage the content" meant "project the same type of

28   services" as Wells Fargo.  Tr. Vol. II 217.

On December 31, 2010, Only Websites' owner Daniel Todd sent Kast a link to what Kast described as the "alpha" or rough version of the Atherton Trust website, which was accessible through Only Websites' website at http://www.onlywebsites.com/1/atherton/. Todd wrote, "we developed your site based off the WF sample." Pls.' Ex. 11; Tr. Vol. II 295. Kast responded, "I like what you have done with the home page layout." Pls.' Ex. 11. He also gave the following feedback:

> I like the logo but think it needs to be warmer like WF, the blue is cold. The picture needs to be more casual like WF showing age differences between client and advisor. I will reuse as many of the pictures from the current site as possible to avoid spending on new pictures.

Id. A few minutes later, Kast wrote to Todd, "Daniel: This is the format for the content pages: https://www.wellsfargo.com/theprivatebank/wealthmanagement/. Pls.' Ex. 12.

According to Kast, the "alpha version had place holders of text and photos, the very rough outline of the website." None of the links or "other functionality" was working on this version of the site and it was not meant to be seen by "customers and potential customers." Tr. Vol. II 179, 296. Kast testified that he was unable to make any changes to the site himself and that any changes had to be made by Only Websites. Id. at 297-98.

Although the record does not contain an exact date, at some point Only Websites incorporated the three photos at issue into the alpha version of the Atherton Trust website. Erickson had licensed these photos to Wells Fargo for use on the Wells Fargo website (the "Erickson photos."). Id. at 298. Kast testified that he did not know where the Erickson photos came from or who owned them. Id. at 178. He denied providing Only Websites with the Erickson photos, instructing Only Website to use photos from the Wells Fargo website, or asking Only Websites to copy the Wells Fargo website. He also denied that he directed Only Websites to any specific photos or webpages on any of the five websites he provided as examples when filling out his questionnaire. According to Kast, he provided the Wells Fargo website as an example of what he wanted on the Atherton Trust website in terms of "that type of functionality" and because he liked the navigation on the Wells Fargo website Id. at 180-81, 224, 296, 300. Kast testified that Only Websites "might have taken some of [the Wells Fargo content] during the place holder phase

1    and grabbed it and put it in there." *Id*. at 216.  Kast assumed that Only Websites had provided the

2    Erickson photos and that it had possibly obtained them from a third party such as Shutterstock.  *Id*.

3    at 300.  According to Kast, he did not ask Only Websites who owned the photos because "[i]t

4    wasn't important" and he "thought [Only Websites] owned them."  *Id*.

5          According to Kast, the Erickson photos "were totally inappropriate" for the Atherton Trust

6    website.  *Id*. at 299.  For example, he testified that one of the Erickson photos "was wrong because

7    . . . the business model for Atherton Trust was never to have a young person trying to advise an

8    older person."  *Id*.  He testified that in January 2011, he told Only Websites to take the Erickson

9    photos down and to use photos from the previous Atherton Trust website so that he could avoid

10   spending money on new photos.  *Id*. at 200-01, 300.  Kast's instruction is not memorialized in

11   writing because, according to Kast, this conversation took place by telephone.  *Id*. at 259; *see also*

12   *id*. at 201.

13         Kast testified that Only Website then directed him to "go to Shutterstock, which they had

14   their master contract with, and find photos that [he] thought would be appropriate."  *Id*. at 201.

15   Kast looked at over 1,000 photos and selected 35 for possible use on the Atherton Trust website.

16   He submitted the 35 photos to Only Websites for its consideration and was told that "35 photos

17   [was] too many" and would cause the website to run slowly.  At some point in late January or

18   early February 2011, Kast agreed with Only Websites to place one photo on the home page, with

19   no photos on any of the secondary pages.  *Id*. at 201-02, 211.

20         Kast corresponded with Only Websites developer Rocky Mortensen regarding the 35

21   images he had selected for possible use on the home page.  *Id*. at 211-12; Pls.' Ex. 13.  On

22   February 1, 2011, Kast emailed Mortenson and told him that he had "found two photos that are

23   closer to what [he] want[ed]," listing photos from commercial photography providers Bigstock

24   and Corbis.  In response, Mortenson wrote, "[w]e can put them in but you will need to pay for it

25   since its [sic] their stuff.  Up to you what you want to do[.]"  Tr. Vol. II 212; Pls.' Ex. 13.  Kast

26   paid $50 for the licensing rights for both photos and emailed them to Mortenson later that day.

27   [Docket No. 374-1 (Def.'s Further Excerpts of Record, "FER") at ECF pp. 28-29.]  Despite

28   providing Only Websites with the two photos for which Kast had purchased licenses on February

United States District Court
Northern District of California

1, 2011, Kast testified that Only Websites did not add either of the photos to the Atherton Trust website until August 2011.  Tr. Vol. II 269-70.[5]

Mortensen left Only Websites in early February.  Kast testified that after Mortenson's departure, the only work done by Only Websites on the Atherton Trust website was to make some of the links functional, even though the target date for launching the redesigned website had been mid-February.  *Id.* at 183.  On February 24, 2011, he wrote to Only Websites, "our website is at a critical stage due to previously planned marketing applications with the state courts to be appointed as authorized guardians.  The courts will be looking at my website to see what services we offer."  *Id.* at 186.  Only Websites then assigned Wilson as the new project manager.  *Id.* at 311.

Kast testified that he did not "rush out or authorize the website to be viewable by the state courts" before it was finalized in order to take advantage of the business opportunity, and that it "would be ludicrous to do something like that" because he would "make a terrible showing."  *Id.* at 187.  However, an April 9, 2011 email written by Kast to Only Websites owner Todd referenced the website being "rushed out" the previous month:

> Since the Alpha go live on March 31st nothing has been done to finish up the changes that need to be made.  I was afraid that rushing the site out after it was 45 days late would result in everyone just dropping it and moving on, which appears to be exactly what happened.

Pls.' Ex. 16.  The following day, April 10, 2011, Kast wrote again to Todd complaining that "[t]his project is 2 months overdue."  He continued:

> The good thing is at least I was able to complete the registration process with the superior court, but the forms and other items that are needed to kick off the prepaid telemarketing mailing etc., which was supposed to happen back in Feb., is still waiting for the site to get finished.  With a 90-180 lead time in closing sales every day the site is late is pushing back revenue.

*Id.*

At trial, Kast testified that the reference he made in his email to "rushing the site out"

---

[5] Kast ultimately decided to use only the Corbis photo on the website.  Tr. Vol. II 270.

United States District Court
Northern District of California

1   meant "rushing to accomplish" the operational, functional stage of the Atherton Trust website—

2   the "beta phase"—and that it did not mean rushing to publish the site to the public.  In other

3   words, according to Kast, the "rushing out" was from the alpha phase to the beta phase of the site.

4   Tr. Vol. II 188-89.  He also testified that his statement regarding the "registration process with the

5   superior court" was a reference to "fill[ing] out paperwork" in order to be accepted by the probate

6   court.  *Id*. at 189.[6]

7        In April 2011, Kast and Wilson revisited the decision to use only one photo on the website.

8   They discussed adding photos on each of the major heading pages.  *Id*. at 204-05; Pls.' Ex. 17

9   (Apr. 16, 2011 email).  According to Kast, Only Websites was "pushing [him] to put more photos"

10  on the site.  *Id*. at 205, 229.  There are no emails documenting these discussions; according to

11  Kast, the conversations usually happened on the telephone.  *Id*. at 205.  Additionally, even though

12  Kast sent Todd and Wilson emails on June 9, 2011 and June 13, 2011 referencing a list of

13  outstanding tasks, including Kast "working on the . . . photos and other details needed to finish the

14  site by the end of June," he did not mention that the Erickson photos were still on the website,

15  despite allegedly having asked Only Websites to remove them in January 2011  *See* Pls.' Ex. 18;

16  Tr. Vol. II 200-01.

17        In May and June 2011 Kast stopped making his monthly payments to Only Websites

18  because he "couldn't get them to do anything . . . that had to be done to get the site to be

19  functional."  *Id*. at 312.

20              **2.    Erickson's Discovery of the Photos on the Atherton Trust Website**

21        Jesse Hughes is the Director of Sales and Marketing for Erickson Productions.  He testified

22  that Erickson licenses photos to corporate clients on a rights-managed basis.  This means that it

23  charges licensing fees for its images based on how the client plans to use the image, including

24  length of time, size, and medium.  [Docket No. 171 (Tr. Vol. I.) 84-85.]  Erickson tracks the rights

25

26  ───────────────

27  [6] In a June 8, 2011 email to Todd, Kast again wrote that "[t]he project was rushed out on March
    31st because it was so late and it was hurting my opportunity to earn revenue from the state court
    system otherwise, I would not have launched until the site was finished."  Docket No. 374-1 at
28  ECF p. 37.  Kast testified that when he used the word "launch[ ]" in this email, he was making a
    reference to launching "marketing to try to develop some revenue."  Tr. Vol. II 190-91.

United States District Court
Northern District of California

1   for all of the photos it licenses, including registering copyrights with the U.S. Copyright Office

2   and watermarking its photos.  *Id*. at 93-94.  It also uses the services of a webcrawler called

3   Picscout that fingerprints Erickson's images, adds them to a database, and then checks "every

4   website in the world" before generating a weekly report regarding where Erickson's images

5   appear online.  *Id*. at 108.  Hughes then reviews the reports to analyze whether the uses of

6   Erickson's images are authorized.  *Id*.  Hughes testified that Picscout cannot view images behind a

7   website's "firewall"; it can only view images on "public websites that are available for anyone to

8   view."  Tr. Vol. III 426-27.

9       Erickson licensed the three photos at issue in this litigation to Wells Fargo for use on its

10  website.  Tr. Vol. I. 97-98.  After Hughes learned from Picscout that the Atherton Trust website

11  contained the three Erickson photos, he personally viewed them on athertontrust.com.  He then

12  contacted Wells Fargo to determine whether Atherton Trust was affiliated with Wells Fargo and

13  learned that it was not.  *Id*. at 99-100; Tr. Vol. III 427.  Hughes then authorized Erickson's

14  attorney to send a cease and desist letter to Atherton Trust.  Tr. Vol. I 111-13; Pls.' Ex. 2 (letter

15  dated July 12, 2011).

16      Kast testified that he did not know that the development version of the Atherton Trust

17  website was live and visible on athertontrust.com until he received the cease and desist letter in

18  July 2011.  According to Kast, the website should not have been visible.  Tr. Vol. II 223, 372.

19  However, on June 13, 2011, one month before receiving the cease and desist letter, Kast

20  forwarded Todd and Wilson a list of 21 requested edits entitled "Beta changes-4/7/11."  Each edit

21  included the www.athertontrust.com URL; none referenced the

22  http://www.onlywebsites.com/w/atherton/ site through which Kast had originally accessed the site

23  during development.  Pls.' Ex. 18.  When asked about the June 13, 2011 document, Kast testified

24  that he believed that the site was behind a firewall and not visible to the public.  Tr. Vol. II 232.

25      Kast also testified that he had made the decision to use one photo on the website and that

26  he had no explanation for why there were still additional photos posted on the Atherton Trust

27  website in July 2011 when he received Erickson's cease and desist letter.  *Id*. at 203.

28      Kast testified that he was "shocked" when he received the cease and desist letter and that

United States District Court
Northern District of California

11

he "couldn't believe that Only Websites would put [his] company in that position" because it goes against his business principles. *Id.* at 320.  Kast forwarded the letter to Wilson at Only Websites on July 12, 2011 and told her to "immediately delete the images referenced which were not intended to be published." Pls.' Ex. 19.  Later that day, he responded to Erickson's attorney via email, stating, "[t]hese images were not authorized to be used during the development of our website, they were apparently used by the company that is updating our website and were not intended to be published." Docket No. 374-1 at ECF p. 13.  On July 13, 2011, Wilson responded to Kast that "[t]hose images have been removed from your current site and the development site." Pls.' Ex. 19.

On August 12, 2011, Kast wrote to Wilson and granted Only Websites authorization to publish the website. Tr. Vol. II 199.  Kast testified that prior to that date he had not given Only Websites authorization to publish the website to make it viewable to the public. *Id.*  He also testified that had no control over Only Websites or its employees, equipment, software, communications, servers, or "the ability to be able to get them to do anything." *Id.* at 203.

## B.    Evidence Regarding Damages

Hughes testified that Erickson charged Wells Fargo a total license fee of $3,645, including "good client" and volume discounts, for five photos in August 2010, including the three at issue here. Tr. Vol. I. 97-98, 104.  At that time, Wells Fargo had been an Erickson client for at least six years.  Prior to the licensing of this group of photos, Wells Fargo had paid Erickson nearly $250,000 in license fees and had hired Erickson for six photo shoots at a cost of approximately $1.3 million. *Id.* at 98-99.  Wells Fargo subsequently removed the photos in question from their own website.  It has not licensed photos from Erickson or hired Erickson to produce photos since that time. *Id.* at 102.

Hughes testified that if Atherton Trust had asked Erickson to license the three photos for use on its website, Erickson would not have granted the license without giving Wells Fargo the right of first refusal to pay for exclusive use of the photos.  Had Wells Fargo refused such an offer, Erickson would have charged Atherton Trust a license fee of $17,000 per image. *Id.* at 104-05. He also testified that if Wells Fargo had sought to re-license the photos on an industry-exclusive

basis, Erickson would have charged between $14,000-$15,000 per image, for at least $42,000. *Id.* at 105-06.

On cross examination, Hughes testified that Erickson "from time to time" grants "composition" or "comp" licenses for its photos. A comp license is a license for "internal use [of a photo] only for under one month"; for example, it is "a license for a developer to use on something like a website to see if the photo would work" or for use in an internal presentation. *Id.* at 121, 128. Erickson charges $100 for a comp license. *Id.*

## III.   LEGAL STANDARDS

### A.  Standard of Review on Remand

The Ninth Circuit did not specify the standard of review on remand, and the parties dispute the applicable standard. The Ninth Circuit's exact instructions were "[w]e remand the issue of willfulness to the district court on the existing record." 921 F.3d at 833. Erickson contends that this means that the court's review is de novo and that it must determine whether substantial evidence supports the jury's finding of willfulness. Pls.' Br. 11. Erickson cites a single case in support of its position, *Apple Inc. v. Samsung Electronics Co., Ltd.*, 258 F. Supp. 3d 1013, 1023 (N.D. Cal. 2017). In *Apple*, a jury found that the defendant willfully infringed a patent. The defendant filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, which permits a district court to grant judgment as a matter of law "when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). The court granted the motion in part and denied it in part, holding that substantial evidence supported the jury's finding that the patent was valid but that the jury's finding on willfulness was not supported by substantial evidence under the then-applicable standard. *Apple*, 258 F. Supp. 3d at 1017, 1021. Both parties appealed. The Federal Circuit upheld the judgment and remanded the issue of willful infringement in light of intervening Supreme Court authority. *Id.* On remand, the court examined whether "substantial evidence—'relevant evidence that a reasonable mind would accept as adequate to support a conclusion'—support[ed] the jury's finding of . . . willfulness," which is the Ninth Circuit's standard for review of a motion for judgment as a matter of law. *Id.* at 1023

13

United States District Court
Northern District of California

1    (quoting *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1366 (9th Cir. 2005)); *see Pavao v.*

2    *Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) ("A jury's verdict must be upheld if it is supported by

3    substantial evidence.").

4        *Apple* is distinguishable.  There, the Federal Circuit directed the district court to "review

5    the sufficiency" of the evidence of willfulness under a newly-announced standard following an

6    order granting in part a motion for judgment as a matter of law.  *Apple*, 258 F. Supp. 3d at 1021,

7    1023.  By contrast, this case involves review following a determination of instructional error.  The

8    Ninth Circuit vacated the jury's willfulness finding due to error in the jury instructions that it

9    found was "likely prejudicial" to Kast.  *Erickson*, 921 F.3d at 834.  It makes little sense to

10   determine whether substantial evidence exists to support the jury's verdict where the verdict

11   potentially was tainted by an erroneous instruction.  Erickson does not cite any case supporting

12   application of the substantial evidence under such circumstances and the court's own research

13   yielded no such authority.

14       For his part, Kast disputes the substantial evidence standard.  He contends that the court

15   should examine whether the preponderance of the evidence supports a finding of willfulness

16   because that is the standard that a jury would apply in determining the issue.  Def.'s Resp. 12-13.

17       Ultimately, the court need not resolve the parties' dispute regarding the applicable standard

18   of review.  For the reasons explained below, the court concludes that the evidence demonstrates

19   that it is "more probably true than not true" that Kast's contributory infringement of Erickson's

20   copyrights was willful, thus satisfying the standard for preponderance of the evidence.  *See* Ninth

21   Circuit Model Jury Inst. 1.6, "Burden of Proof—Preponderance of the Evidence.  It is an

22   "unquestionable proposition that substantial evidence is a lower evidentiary standard than a

23   preponderance of the evidence."  *See Khadka v. Holder*, 618 F.3d 996, 1002 n.5 (9th Cir. 2010).

24   Accordingly, since the evidence establishes Kast's willfulness under the preponderance of the

25   evidence standard, it necessarily follows that the evidence satisfies the lower substantial evidence

26   standard.

27       **B.    Willfulness**

28       "A party engages in contributory copyright infringement when it '(1) has knowledge of

14

United States District Court
Northern District of California

another's infringement and (2) either (a) materially contributes to or (b) induces that infringement.'" *Erickson*, 921 F.3d at 831 (quoting *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 745 (9th Cir. 2019)). As noted, the jury found that Kast contributorily infringed Erickson's copyright in the three photos based on the theories that Only Websites "cop[ied] or publish[ed] copies of" the photos without permission and thus infringed Erickson's copyrights and the Ninth Circuit affirmed the contributory liability verdict. *Id*. at 831-32.[7]

The Copyright Act provides that "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). In order to prove willfulness, "the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *Erickson*, 921 F.3d at 833 (citations omitted). "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id*. (quoting *Global-Tech Appliances, Inc. v. SEB S.A*., 563 U.S. 754, 769-70 (2011)). "[A] reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing . . . ." *Id*. (quoting *Global-Tech Appliances*, 563 U.S. at 770).

---

[7] The court declines to consider Kast's argument that the contributory infringement verdict was incorrect, as the Ninth Circuit addressed this argument and rejected it on appeal. *Erickson*, 921 F.3d at 831-32; Def.'s Br. 18.

The court also declines to consider Kast's argument, apparently raised for the first time on remand, that the court should find that he was an innocent infringer under 17 U.S.C. § 504(c)(2), which provides that "[i]n a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." *See* Def.'s Br. 13-15. The jury rejected Kast's claim that any infringement was innocent, *see* Jury Instruction no. 20, Verdict, and found that Kast contributorily infringed Erickson's copyright, which required proof that Kast "(1) ha[d] knowledge of another's infringement and (2) either (a) materially contribute[d] to or (b) induce[d] that infringement." *Erickson*, 921 F.3d at 831. A finding of innocent infringement is inconsistent with the contributory infringement verdict, which the Ninth Circuit affirmed. *See id*. at 831-32.

United States District Court
Northern District of California

## IV.    ANALYSIS

### A.  Willfulness

The court finds that the evidence presented at trial shows that it is more probably true than not true that Kast's contributory infringement was the result of reckless disregard for Erickson's copyrights under the Ninth Circuit's standard, and was thus willful.

It is undisputed that Kast knew in January 2011 that the Atherton Trust website displayed the three Erickson photos.  He testified that he did not know where the photos came from or who owned them, but his testimony is undermined by other evidence in the record.  In particular, there is no dispute that the photos "were copied and used [on the Atherton Trust website] exactly as they appeared" on the Wells Fargo site, and the evidence shows that Kast was not only familiar with the Wells Fargo website, but that he repeatedly asked Only Websites to emulate the Wells Fargo website in the Atherton Trust website.  Tr. Vol. II 178; Order on Summ. J. 5.  For example, Kast listed the Wells Fargo website on the Only Websites questionnaire as the first of five examples of competitors' websites for Only Websites to review.  He wrote in response to the questionnaire that "WF site is professional yet has personal feel," described its "positive attributes," and under "special instructions" specified its navigation features.  He also testified that the Wells Fargo website had "the best look, the best functionality" and was "the easiest to use."  Pls.' Ex. 11; Tr. Vol. II 180-81.

Kast continued to reference details about the Wells Fargo website after completing the questionnaire.  On December 20, 2010, Kast emailed the Atherton Trust logo to Wilson and wrote, "[b]eside the logo where the WF site has the words The Private Bank put the words The Private Trust Company on our site."  Pls.' Ex. 4.  On December 31, 2010, Todd sent Kast a link to the alpha version of the Atherton Trust website and wrote, "we developed your site based off the WF sample."  In response, Kast asked Only Websites to emulate certain features on the Wells Fargo website, writing "the logo . . . needs to be warmer like WF."

Importantly, Kast also specifically referenced the photos on the Wells Fargo website: "[t]he picture needs to be more casual like WF showing age differences between client and advisor."  Pls.' Ex. 11.  Kast followed up by sending Todd a link to the Wells Fargo website,

United States District Court
Northern District of California

1    writing, "[t]his is the format for the content pages[.]"  Pls.' Ex. 12.

2    Kast denied directing Only Websites to any specific photos or webpages on the Wells

3    Fargo website and testified that he used that website merely as an example of the "functionality"

4    and "navigation" he wanted on the Atherton Trust website.  Tr. Vol. II 180-81, 224, 296, 300.  But

5    this testimony is inconsistent with his written communications to Only Websites.  As noted above,

6    he asked Only Website to make his logo "warmer like WF," and to use a photo like the one on the

7    Wells Fargo website.  In December 2010, in response to a question about whether Only Websites

8    would "be using mostly the content" that was already on the current Atherton Trust website, he

9    wrote that "not much will transfer over from our current site" and that they would "leverage the

10   *content* from the competitor's sites."  He made no mention of any other websites' "functionality"

11   or "navigation."  Pls.' Ex. 10 (emphasis added).

12   At some point Only Websites added the Erickson photos to the Atherton Trust website.

13   Kast admitted that he was aware that the photos were on the Atherton Trust website in January

14   2011.  He testified that he never asked who owned the Erickson photos and simply assumed that

15   Only Websites had obtained licenses to use them.  Tr. Vol. II 300-01.  This was not a reasonable

16   assumption, given the evidence of Kast's detailed familiarity with the Wells Fargo website,

17   including the photos posted on that site.  The obvious inference from the contemporaneous,

18   written evidence is that Kast knew that the photos on the Atherton Trust website were identical to

19   those on the Wells Fargo website, and therefore knew that Only Websites had simply copied the

20   Erickson photos from the Wells Fargo website.  Yet Kast never took any affirmative steps to

21   determine whether the Erickson photos—copied directly from a competitor's website—were

22   copyrighted or whether Only Websites had obtained licenses to use the photos.  In *Unicolors*, the

23   Ninth Circuit concluded that evidence of similar conduct, including making "no attempt to check

24   or inquire into whether" certain designs were subject to copyright protections, "tak[ing] no

25   affirmative action to determine" if specific designs are copyrighted, and making no "attempt to

26   discover the origins" of certain designs, was "sufficient to show that [a defendant] acted with

27   reckless disregard for the possibility" that it was using a design that was protected by copyright.

28   *See Unicolors*, 853 F.3d at 991.

United States District Court
Northern District of California

Kast offered other testimony that was undermined by contemporaneous evidence of his communications with the developers.  For example, Kast testified that he disliked the Erickson photos that appeared on the Atherton Trust website and that he asked Only Website to take the photos down.  According to Kast, one of the Erickson photos "was wrong because . . . the business model for Atherton Trust was never to have a young person trying to advise an older person."  Tr. Vol. II 299.  This statement is expressly contradicted by his December 31, 2010 email to Todd: "The picture needs to be more casual like WF showing age differences between client and advisor."  Pls.' Ex. 11.  Kast also testified that he asked Only Websites to remove the Erickson photos, but he never memorialized this instruction in writing; this stands in contrast to the many other edits and revisions that Kast set forth in emails to the developers.  Tr. Vol. II 299, 200-01, 259, 300; *see* Pls.' Exs. 4, 9-13, 16-18.  Further, despite his close management of the development process and subsequent references to "working on the . . . photos and other details needed to finish the site," there is no evidence that Kast ever followed up with Only Websites about taking down the Erickson photos or that he took any steps to ensure that they were removed.  *See, e.g.*, Pls.' Ex. 18.

Additionally, even though Kast testified that he directed Only Websites to take the Erickson photos down because he did not like them, Tr. Vol. II 200-201, he takes a somewhat different position in the current briefing.  Now Kast takes the position that the Erickson photos were simply "temporary placeholders" for use on the Atherton Trust website during the design process, and that he intended to replace them with the two photos he personally licensed.  Def.'s Br. 9-10 (citing Tr. Vol. II 179).  As an initial matter, Kast does not explain how the use of the Erickson photos as "placeholders" defeats a finding of willful contributory copyright infringement based on the theory that Only Websites copied the photos without permission.  Under the Copyright Act, the reproduction of the Erickson photos on the Atherton Trust website, whether developmental or publicly facing version, constitutes copyright infringement.  *See* 17 U.S.C. §§ 106(1) ("the owner of copyright . . . has the exclusive rights to . . . reproduce the copyrighted work in copies . . ."); 501(a) ( "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright").

18

Moreover, there is evidence that Kast authorized the Atherton Trust website to go live and viewable to the public while still displaying the Erickson photos, despite Kast's claim that he asked Only Websites to remove them.  Although Kast testified that he did not know that the Atherton Trust website was viewable to the public until he received Erickson's cease and desist letter, his emails suggest otherwise.  Kast's April 11, 2011 email references "Alpha go live on March 31st" and "rushing the site out."  Pls.' Ex. 16.  On June 8, 2011, he wrote to Todd, "[t]he project was rushed out on March 31st because it was so late and it was hurting my opportunity to earn revenue . . . otherwise, I would not have launched until the site was finished."  Pls.' Ex. 9. Additionally, on June 13, 2011, he sent Todd and Wilson a list of requested edits regarding the www.athertontrust.com URL; none of the edits referenced the Only Websites web address through which he had previously accessed the developmental site.  This supports the inference that Kast knew the website was viewable online before he received the cease and desist letter.  Pls.' Ex. 18. Thus, the evidence also supports the inference that Kast intended to publish the photos on his website, the other basis for contributory copyright infringement on which the jury was instructed, even though he never took any steps to determine whether Only Websites had obtained licenses to use them.  *See* 17 U.S.C. § 106(5) ("the owner of copyright . . . has the exclusive rights to . . . display the copyrighted work publicly . . .").  This is further evidence that he acted recklessly with respect to Erickson's copyrights.  *See Unicolors*, 853 F.3d at 992 ("a party may act recklessly by refusing . . . to even investigate or attempt to determine whether particular designs are subject to copyright protections.").

Kast argues that the evidence does not establish willful infringement because he reasonably assumed that Only Websites had obtained permission to use the Erickson photos.  This argument largely rests on his contract with the developer, the relevant language of which is as follows: "Client is responsible for obtaining copyright releases and licenses on all photos it sends to [Only Websites.  Limit of 2 photos provided by [Only Websites] for every page except the home page." Pls.' Ex. 5 at 2 (K034-35).  Kast testified that he understood this provision to mean that "[a]nything that I sent to them had to be licensed," and that if Only Websites "provided the photos, [it] had to provide licensed photos."  Tr. Vol. II 291.  He contends that this evidence supports that

1    he "reasonably believed it was Only Websites' responsibility to obtain licenses for Erickson's

2    photos" and thus did not willfully infringe Erickson's copyrights. *Erickson*, 921 F.3d at 834;

3    Def.'s Br. 6. Kast notes that he took actions consistent with this understanding by paying for the

4    licenses for two photos he sent to Mortenson.

5          Notably, the contract language does not specify that Only Websites would provide two

6    *licensed* photos per page, undermining Kast's claim that he understood this language to mean just

7    that. But the larger problem with this argument is that it ignores the context surrounding the use

8    of the Erickson photos on the Atherton Trust website. The Erickson photos were not random,

9    arbitrary photos that Only Websites might have selected from Shutterstock and used during the

10   development of the website. They were photos on a website that Kast had repeatedly and

11   specifically directed the developers to emulate. From the beginning of the project, Kast's

12   communications with Only Websites show that he was very familiar with the contents of Wells

13   Fargo's website, including the photos that appeared on that website. These include his emails that

14   he would "leverage the content from the competitor's sites," that "[t]he picture" on the alpha

15   version of the website "needs to be more casual like WF showing age differences between client

16   and advisor," and that the logo "needs to be warmer like WF." Based on this evidence, it is not

17   likely that Kast failed to recognize the Erickson photos or did not know where they had come

18   from; rather, this evidence supports the inference that Kast knew Only Websites had copied them

19   from the Wells Fargo website. Further, it was not reasonable for Kast to assume that Only

20   Websites had obtained licenses to use the photos it had simply copied from a competitor's

21   website. This evidence supports the conclusion that Kast decided to "st[i]ck his head in the sand"

22   when it came to the copyrights, a finding that supports that he was reckless as to Erickson's

23   copyrights. *See* Pls.' Br. 15; *Unicolors*, 853 F.3d at 991.

24         Kast also notes that upon receiving Erickson's cease and desist letter, he immediately

25   asked Only Websites to take down the photos. He argues that this action shows that he was not

26   reckless as to Erickson's copyrights. *See Erickson*, 921 F.3d at 834-35. But the language he used

27   in his email to Only Websites undermines this argument. He wrote "immediately delete the

28   images referenced *which were not intended to be published*." Pls.' Ex. 19 (emphasis added). His

United States District Court
Northern District of California

use of the term "published" instead of "used" is telling; it supports the inference that he intended to use the Erickson photos at least while the site was in development.

In sum, the court concludes that the evidence at trial shows that it is more probably true than not that Kast acted in reckless disregard of the "substantial and unjustified risk" that Only Websites had simply copied the Erickson photos from the Wells Fargo website and had not obtained licenses for them. *See Erickson*, 921 F.3d at 833; *VHT*, 918 F.3d at 748 ("[r]eckless disregard can be demonstrated, for example, when a party 'refus[es], as a matter of policy, to even investigate or attempt to determine whether particular [photos] are subject to copyright protections.'" (brackets in original) (quoting *Unicolors*, 853 F.3d at 992)). Therefore, the evidence supports the conclusion that Kast's contributory infringement of the Erickson photos was willful.

### B.      Damages

As noted, if a copyright owner proves that infringement was "willful," the court may award statutory damages of $150,000 per work infringed. 17 U.S.C. § 504(c)(2). In this case, the jury found that Kast's contributory and vicarious infringement was willful and awarded Erickson $450,000 in statutory damages. *See Erickson*, 921 F.3d at 833. The Ninth Circuit affirmed the jury's contributory infringement verdict, and as discussed above, the court finds that the evidence shows willfulness under the preponderance of the evidence standard. Accordingly, the court affirms the jury's statutory damage award of $150,000 per photo and awards Erickson $450,000 in statutory damages.

## V.      CONCLUSION

For the foregoing reasons, the court finds that the evidence at trial demonstrates that Kast's contributory infringement of Erickson's copyrights in the three photos was willful and awards Erickson $450,000 in statutory damages under 17 U.S.C. § 504(c)(2).

**IT IS SO ORDERED.**

Dated: February 12, 2021

_____
Donna M. Ryu
United States Magistrate Judge